DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

HILLSBOROUGH COUNTY,

Appellant,

v.

ANGELO GIAMBRONE,

Appellee.

No. 2D2025-0115

_____

July 29, 2026

Appeal from the Circuit Court for Hillsborough County; Melissa M. Polo,
Judge.

Stephen M. Todd, Senior Assistant County Attorney, Tampa, for
Appellant.

Michael C. Minardi of Minardi Law, PLLC, Tampa, for Appellee.

James Uthmeier, Attorney General, and Foster H. Swartz, Solicitor
General Fellow, Jeffrey Paul DeSousa, Acting Solicitor General, and
Jason J. Muehlhoff, Chief Deputy Solicitor General, Tallahassee, for
Amicus Curiae.

LABRIT, Judge.

Hillsborough County appeals a final judgment that awards Mr.
Angelo Giambrone back pay and compensatory damages, and also
prospectively prohibits the County from "discriminating against"—and
requires the County to "provide an accommodation" to—*any* employee
who presents a medical marijuana card after testing positive for
marijuana, so long as there is "no evidence" the employee used, or was

under the influence of, medical marijuana at work, on County property, or in a County vehicle. The underlying summary judgment order rests on three core premises: (1) that a medical marijuana card qualifies as "Prescription or Nonprescription Medication" under the governing collective bargaining agreement (CBA), such that a Medical Review Officer (MRO) was required to "verify the test as negative"; (2) that Florida's medical marijuana constitutional amendment affirmatively requires "Qualified Patients" to be allowed to use medical marijuana off-site and correspondingly requires employers to accommodate that use; and (3) that, as a result, the County could not discipline Mr. Giambrone based on a positive test absent proof of on-duty impairment. Those premises cannot be squared with the governing texts or with the limited role of the judiciary in adjudicating individual employment disputes. Therefore, we reverse.[1]

## I.    Background

### A.    Facts and Procedural History

In the order granting Mr. Giambrone's motion for summary judgment, the trial court relied on the following undisputed facts. Mr. Giambrone worked for Hillsborough County Fire Rescue as a firefighter paramedic. On February 26, 2019, he was selected for a random urine drug test, and the County received the results on March 1, 2019, showing a positive test for marijuana. The County did not select Mr. Giambrone for testing because of any workplace incident; the trial court

---

[1] We emphasize at the outset the narrowness of our decision: this appeal turns on the interaction between Florida's constitutional and statutory framework for medical marijuana and the County's drug-free workplace policy as applied to employees covered by this particular CBA. How other employers, or employees subject to different CBAs or different policies, may address medical marijuana is not before us.

2

found the screening "was strictly random," and it also found, based on the County's admissions, no evidence that (a) Mr. Giambrone used or possessed marijuana on work premises or during work hours; (b) Mr. Giambrone had any work performance evaluations alleging impairment; or (c) Mr. Giambrone's employment record reflected any prior complaint or suspicion of impairment. The County placed him on unpaid administrative leave based on the positive test, and he has remained on that status through the inception of this appeal.

After being placed on unpaid administrative leave, Mr. Giambrone filed this civil action against the County. Mr. Giambrone's complaint asserted (1) a Florida Civil Rights Act claim premised on a failure to accommodate, (2) a "wrongful termination" claim premised on the County's refusal to accept the medical marijuana card as justification for the positive result under the County's drug-free workplace policy and the CBA, (3) a claim alleging failure to update the County's drug-free workplace policy, and (4) a breach of contract claim alleging violations of the County policy and the CBA. After discovery, both sides moved for summary judgment, and in December 2024, the trial court entered an order granting Mr. Giambrone's amended motion for final summary judgment and denying the County's motion.

Thereafter, the trial court entered a final judgment that granted Mr. Giambrone relief on the pleaded counts and, in addition, awarded broad prospective relief directed beyond the individual dispute—mandating that the County must "provide an accommodation to employees who present a valid State of Florida Medical Marijuana Card after testing positive for marijuana" so long as there is "no evidence" of on-duty use, possession, or working "under the influence."

3

## B.    The Governing Texts

At all relevant times, Mr. Giambrone's employment was governed by the CBA,[2] which contains a detailed "Substance Abuse Policy." Section 40.1(A) of the CBA broadly prohibits all employees from using, possessing, or being under the influence of a drug while at work, on County property, in a County vehicle, or while displaying a County logo. Notably, the CBA also prohibits employees from engaging in the same conduct "at any time while employed by Hillsborough County Fire Rescue, other than alcohol or prescribed medications."  The CBA defines "Drugs" to mean cannabinoids as well as alcohol and other listed substances (including various prescription drugs such as opiates and benzodiazepines) and their metabolites—reflecting a negotiated testing regime that extends well beyond criminally prohibited substances.  The CBA separately prohibits all employees "from reporting to work when it is determined that the employee is Impaired," and it defines "Impaired" to mean "a confirmed positive drug test" based on any testing described in the agreement.

The CBA provides for "Random Drug Testing," under which up to five employees may be selected each pay period, and provides that "[a]ll Employees will be placed on paid administrative leave until a Confirmation Test can be performed and/or a valid result is obtained." For a "First Time Confirmed Positive Drug Test," the CBA contemplates a referral to treatment and rehabilitation, placement on leave without pay during the program, and a required return-to-work drug test, and it

---

[2] The CBA is between the Hillsborough County Board of County Commissioners and the International Association of Firefighters, Local 2294.  An express purpose of the CBA is to "set forth the entire agreement between the parties concerning wages, hours, and terms and conditions of employment" for firefighters employed by the County.

4

provides that "[a] negative test result must be obtained prior to an employee returning to work," followed by "Follow-up Drug Testing."

The CBA also defines "Prescription or Nonprescription Medication" as "a drug or medication obtained pursuant to a prescription as defined by s[ection] 893.02 or a medication that is authorized pursuant to federal or state law for general distribution and use without a prescription in the treatment of human diseases, ailments, or injuries." The referenced statute, section 893.02(24), Florida Statutes (2019), in turn, defines a "Prescription" as an order that, among other things, "is intended to be dispensed by a person authorized by the laws of this state to do so, and [which] meets the requirements of s[ection] 893.04."

In addition to the CBA, the County maintained a countywide drug-free workplace policy[3] that sets drug and alcohol testing procedures, including reasonable suspicion testing, postaccident and postinjury testing, and random testing for certain safety-sensitive positions. Under the policy's "Over the Counter or Prescription Drugs" provision, employees and applicants "should confidentially report the use of prescription or nonprescription medications to the County's Medical Review Officer (MRO) when contacted by the MRO," and they have an opportunity to "contest or explain the result to the MRO within five working days after written notification of the positive test result." The policy provides that if the employee's explanation or challenge is "unsatisfactory to the MRO, the MRO shall report a positive test result back to the employer" but "[i]f an employee or job applicant has provided an adequate explanation regarding prescription or non-prescription drug

---

[3] As the trial court correctly noted, the drug-free workplace policy and the CBA are contracts that bind both the County and Mr. Giambrone.

5

use that may affect the test results, the MRO will verify the test as negative and report back to the employer."

The "Failure to Comply With Policy" section provides that the County "retains the absolute right to terminate an employee for first-time verified positive test results . . . without offering the benefit of a rehabilitation program," and it states that participation in a rehabilitation program "does not restrict" the County's right to discipline the employee "up to and including termination, even for a single violation." Where rehabilitation is offered following a first-time positive, the policy provides that the employee "will be immediately removed from work" and may return only after completing recommended treatment and obtaining "a negative test result on a return-to-duty drug test," followed by unannounced follow-up testing; it further states that rehabilitation "will not be offered for a second time positive" and that the employee "will be terminated from employment."

Florida's constitutional and statutory medical marijuana provisions are jugular to resolution of this dispute. The Florida Constitution provides that "[t]he medical use of marijuana by a qualifying patient . . . is not subject to criminal or civil liability or sanctions under Florida law," but it also states that "[n]othing in the section requires the violation of federal law or purports to give immunity under federal law" and that "[n]othing in the section shall require any accommodation of any on-site medical use of marijuana in any . . . place of . . . employment." Art. X, § 29(a)(1), (c)(5), (c)(6), Fla. Const. The implementing statute similarly provides, in its "Applicability" subsection, that it "does not limit the ability of an employer to establish, continue, or enforce a drug-free workplace program or policy . . . [and it] does not require an employer to accommodate the medical use of marijuana in any workplace or any

6

employee working while under the influence of marijuana"; the statute further provides that it "does not create a cause of action against an employer for wrongful discharge or discrimination."  § 381.986(15)(a)–(c), Fla. Stat. (2019).

## II. <u>The Summary Judgment Rests on Legal Error</u>

### A. Standard of Review

We review the entry of summary judgment de novo.  *See Volusia County v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 130 (Fla. 2000).  Contract interpretation is a question of law and is likewise reviewed de novo.  *See Fitness Int'l, LLC v. 93 FLRPT, LLC*, 361 So. 3d 914, 918 (Fla. 2d DCA 2023).

### B. Medical Marijuana Is Neither a Prescription nor a Nonprescription Medication Under the CBA

The trial court determined that medical marijuana is "considered a prescription or akin to a prescription, as it is an order for drugs written by a licensed doctor . . . [and] nowhere in [the CBA] is medical marijuana enumerated as distinct from all other prescribed medications."  As the County correctly argues, the trial court reversibly erred in so concluding, and that error permeates the order on review.  The trial court's CBA analysis starts in the right place—the CBA's definition of "Prescription or Nonprescription Medication"—but then departs from the actual words of that definition.  As the trial court recognized, section 40.2(L) of the CBA defines "Prescription or Nonprescription Medication" as "a drug or medication obtained pursuant to a prescription as defined by s[ection] 893.02 or a medication that is authorized pursuant to federal or state law for general distribution and use without a prescription in the treatment of human diseases, ailments, or injuries."  Treating this provision as a "broad definition" that "encompasses medications authorized under federal or Florida law," the trial court ultimately

7

concluded that medical marijuana is a medication authorized for general distribution because Florida has "over 880 thousand [medical marijuana] patients" and "over 650 retail stores to distribute medical marijuana."  As we will explain, marijuana is neither a medication "obtained pursuant to a prescription as defined by s[ection] 893.02," nor one that is authorized by "federal or state law for general distribution and use without a prescription."

> 1.  *Medical Marijuana Is Not a Prescription Medication Under the CBA*

Medical marijuana does not fit within the first clause of section 40.2(L) of the CBA because it is not "a drug or medication obtained pursuant to a prescription as defined by s[ection] 893.02."  Section 893.02(24) defines a "Prescription" as an order for drugs or medicinal supplies that, among other things, is "intended to be dispensed by a person authorized by the laws of this state to do so, and [which] meets the requirements of s[ection] 893.04."  Under ordinary rules governing incorporation by cross-reference, the reference to section 893.04 is part of what the defined term means; it is not surplus.  *See, e.g., Van Pelt v. Hilliard*, 78 So. 693, 698 (Fla. 1918) ("In the construction of such statutes the statute referred to is treated and considered as if it were incorporated into and formed part of that which makes the reference.").  The statutory definition therefore requires, as a condition of qualifying as a "prescription," that the order be one that can "meet[] the requirements of s[ection] 893.04."

That matters because section 893.04 creates a pharmacist dispensing framework: it authorizes "[a] pharmacist"[4] to dispense

---

[4] Under section 893.02(19), " 'Pharmacist' means a person who is licensed pursuant to chapter 465 to practice the profession of pharmacy in this state."

controlled substances "upon a written, oral, or electronic prescription," and it then imposes the detailed requirements governing that prescription dispensing system. *See Cohn v. Dep't of Prof'l Regul.*, 477 So. 2d 1039, 1041 (Fla. 3d DCA 1985) ("A pharmacist . . . may dispense controlled substances upon a written or oral prescription." (emphasis omitted) (quoting § 893.04(1))); *see also* § 893.04(1)(b)–(g), (2)(a)–(f) (requiring, among other things, that prescriptions be dated and signed when issued, include specified identifying information, be retained on file, and comply with refill and quantity limits). When the contractual definition uses "prescription as defined by s[ection] 893.02" and section 893.02(24) requires that the prescription "meet[] the requirements of s[ection] 893.04," the combined effect is to define a "prescription" as an order that is legally capable of being dispensed by a pharmacist licensed under chapter 465 in compliance with section 893.04.

Medical marijuana does not pass through that system; it is dispensed through a separate regime specifically created for that purpose. The trial court attempted to avoid this conclusion by declaring that a medical marijuana treatment center "fits the definition of [a] Special Pharmacy" under section 465.003(11)(a)4, Florida Statutes (2019). But that label cannot be reconciled with the governing statutory text. Chapter 465 defines a "special pharmacy" as a location where "medicinal drugs are compounded, dispensed, stored, or sold." *See* § 465.003(11)(a)4. "Medicinal drugs," in turn, are limited to "prescription" or "legend" drugs that federal or state law requires to be dispensed "only on a prescription." *See* § 465.003(8). And chapter 465's operative definitions confirm that this is a pharmacist-centered prescription system: "dispense" means "the transfer of possession" of a

9

medicinal drug "by a pharmacist," *see* § 465.003(6), and a "pharmacist" is a person licensed under chapter 465, *see* § 465.003(10).

Medical marijuana does not operate within that framework. Florida law defines "medical use" of marijuana as conduct "authorized by a physician certification," not a prescription, *see* § 381.986(1)(j), and the legislature expressly provided that a licensed medical marijuana treatment center and its employees "are not subject to licensure or regulation under chapter 465" for "dispensing" marijuana. § 381.986(14)(e). The trial court's "special pharmacy" finding thus collapses two distinct statutory regimes—one built around pharmacist dispensed prescription drugs, the other built around physician certification and licensed treatment centers—and it cannot supply the predicate for treating medical marijuana as a chapter 465 "pharmacy" product in the first place.

The upshot is straightforward, and it follows from the statutory architecture the parties incorporated. Section 40.2(L)'s first clause is keyed to a "prescription as defined by s[ection] 893.02," and that definition in turn requires an order that is legally capable of being dispensed through the pharmacist-centered system described in section 893.04. Medical marijuana is obtained by physician certification and dispensed through licensed treatment centers under a separate statutory regime—not by pharmacists pursuant to section 893.04—and the trial court's attempt to recharacterize a medical marijuana treatment center as a "special pharmacy" under chapter 465 cannot rewrite those threshold statutory definitions. Accordingly, even if a medical marijuana authorization card resembles a prescription in function or appearance, it

10

is not a "prescription" as the CBA defines that term by incorporation, and it therefore cannot satisfy section 40.2(L)'s first clause.[5]

### 2. Medical Marijuana Is Not a Nonprescription Medication Under the CBA

Turning to the second clause of section 40.2(L), the trial court's reasoning replaces that clause's limiting words—"general distribution and use without a prescription"—with a very different concept: widespread participation in a regulated program. The second clause is not satisfied by showing that a medication is "authorized" in *any* sense; the CBA requires that the medication be authorized under state or federal law "for general distribution and use without a prescription."

Medical marijuana is not authorized for "general distribution and use without a prescription" under federal law; to the contrary, federal law wholly prohibits such conduct with respect to marijuana. *See* 21 U.S.C. § 812(c) (2018); 21 U.S.C. § 844(a) (2018); *see also Beckman v. Collier Cnty. Bd. of Cnty. Comm'rs*, No. 2:24-cv-585-JES-DNF, 2026 WL 91580, at *3 (M.D. Fla. Jan. 13, 2026) (summarizing that under the Controlled Substances Act "mere possession of marijuana is a federal crime everywhere in the United States").[6] Nor is medical marijuana authorized

---

[5] Other courts construing analogous medical marijuana regimes have likewise recognized the same basic point: a medical marijuana registry card or physician "authorization" is not a "prescription," and marijuana's federal classification precludes it from being "prescribed" in the ordinary controlled substances sense. *See Beinor v. Indus. Claim Appeals Off.*, 262 P.3d 970, 974 (Colo. App. 2011) (observing that "[m]arijuana, in contrast, remains a Schedule I controlled substance under the applicable federal statute and consequently cannot be prescribed" and concluding that medical use by an employee holding a registry card "is not pursuant to a prescription").

[6] After oral argument, but before issuance of this opinion, the Acting Attorney General for the United States issued a final rule, effective April 28, 2026, placing FDA-approved drug products containing

pursuant to Florida law for "general distribution and use without a prescription"; it is dispensed through a patient-specific regime limited to "medical use by a qualified patient." *See Baxter v. State*, 389 So. 3d 803,

marijuana and marijuana subject to a state medical marijuana license into federal schedule III. *See* Schedules of Controlled Substances: Rescheduling of Food and Drug Administration Approved Products Containing Marijuana From Schedule I to Schedule III; Corresponding Change to Permit Requirements, 91 Fed. Reg. 22,714, 22,714–15, 22,719 (Apr. 28, 2026) (to be codified at 21 C.F.R. pts. 1300, 1301, 1308, 1312). We are aware of that change, but it does not alter our analysis for two independent reasons.

First, even under the new federal rule, state licensed medical marijuana is still not authorized for general distribution and use in the manner contemplated by section 40.2(L)'s nonprescription clause. It remains limited to medical purposes, to users authorized by state law, and to dispensing through licensed entities under a controlled regulatory regime. *See* 91 Fed. Reg. at 22,721-22 (creating a registration framework for state licensees and providing that registrants may dispense marijuana only to individuals "authorized by state law to possess marijuana . . . for medical purposes"); *id.* at 22,722 (providing that a state-law "certification or other document" sufficient to obtain marijuana for medical purposes will suffice to permit dispensing). That is not the same thing as an over-the-counter drug made available for general public distribution and use without individualized medical authorization. Indeed, schedule III drugs ordinarily remain subject to a prescription-based dispensing framework. *See* 21 U.S.C. § 829(b) (2018) (providing that, absent direct dispensing by a practitioner, no schedule III or IV prescription drug "may be dispensed without a written or oral prescription"); 21 U.S.C. § 829(d) (separately addressing "[n]on-prescription drugs with abuse potential").

Second, and in any event, this civil controversy is governed by the law in effect when the cause of action arose, not by a later federal rule change that occurred while the appeal was pending. *Cf. Abner v. Lyft Fla., Inc.,* 422 So. 3d 1226, 1229 (Fla. 3d DCA 2025) ("We apply the law in effect at the time the cause of action accrued."). When the events underlying this dispute occurred in 2019 and when this action was filed in 2020, marijuana remained in federal schedule I and federal law did not authorize its use in any circumstance. Thus, the intervening federal rescheduling does not affect the disposition of this appeal.

12

809–10 (Fla. 5th DCA 2024) (en banc) (emphasis omitted) (quoting § 381.986(g), Fla. Stat. (2021)).

A category limited to medications authorized "for general distribution and use without a prescription" cannot be read as a catchall for any medication that is lawful or available in Florida. That interpretation would deprive the limiting phrase "for general distribution and use without a prescription" of any work to do—effectively rewriting the second clause into "any medication authorized under state law"—and would largely collapse the CBA's two-part definition by making the separate "prescription as defined by s[ection] 893.02" prong unnecessary in practice. *See Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004) (rejecting a construction that would make contractual language "absolutely useless" and reiterating that courts must "construe contracts in such a way as to give reasonable meaning to all provisions" (quoting *Hardwick Props., Inc. v. Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998))).

### 3. The MRO Was Not Required to Report the Test as Negative

Once section 40.2(L) is read as written, the rest of the trial court's CBA analysis crumbles. The order states that after the positive test, Mr. Giambrone "timely provided the MRO with his state issued medical marijuana card as justification of the positive test result," and it treats that card as requiring the MRO to "verify the test as negative." And the "verification as negative" mechanism is triggered when the employee provides an "adequate explanation regarding prescription or non-prescription drug use." But a medical marijuana card is neither "a prescription as defined by s[ection] 893.02" nor evidence that marijuana is "authorized . . . for general distribution and use without a prescription."

13

In sum, the trial court's conclusion that the County was contractually obligated to treat a positive test as negative rests on a premise that is wholly unsupported and is in fact contradicted by the CBA's text. Judgment cannot be sustained on a judicial rewriting of unambiguous definitions. *See Lambert v. Berkley S. Condo. Ass'n*, 680 So. 2d 588, 590 (Fla. 4th DCA 1996) ("[W]hen a document's language is clear, a court cannot indulge in construction or interpretation of its plain meaning." (citing *BMW of N. Am., Inc. v. Krathen*, 471 So. 2d 585, 587 (Fla. 4th DCA 1985))).

## C. The Trial Court Improperly Narrowed the CBA's Drug Prohibitions

The trial court did not limit its analysis to the definition of "Prescription" and "Nonprescription." It also construed the CBA's substance abuse prohibitions in a manner that materially narrows their scope. The order states that the "plain language" of section 40.1(A) of the CBA "only prevents" employees from using substances or illegal drugs in four circumstances: while at work, on County property, in County vehicles, or while reporting to work "under the influence." Under the trial court's lights, the policy is essentially cabined to on-duty conduct or the employee's condition at the start of a shift; absent proof of on-duty use or contemporaneous impairment, the employer's rules would not be triggered.

But, as the County correctly notes, that construction is irreconcilable with the operative text the trial court itself quoted. The quoted prohibition is not limited to on-duty use. It prohibits a broad range of conduct—use, possession, consumption, purchase, sale, distribution, transfer, and being "under the influence" of a "[d]rug"—and then lists multiple independent settings in which that prohibition applies. Subsections (1) through (3) of section 40.1(A) address the

14

settings the trial court emphasized.  The same provision, however, includes an additional and distinct prohibition in subsection (5): employees are prohibited from using drugs "at any time while employed by Hillsborough County Fire Rescue, other than alcohol or prescribed medications."  The trial court's repeated characterization of section 40.1(A) as a "workplace only" rule nullifies subsection (5) and impermissibly ignores the "at any time while employed" language.

That approach is not permissible as a matter of interpretation.  Courts must construe text so as to give effect to all of its material terms, rather than adopting a reading that renders an express clause inoperative.  *See Publix Super Mkts., Inc.*, 876 So. 2d at 654.  And the "at any time while employed" language is not an idle appendage.  In a public safety setting—and particularly for first responders who may be subject to call-back and emergency deployment—such language reasonably reflects an expectation of continuous fitness and readiness, not merely the absence of observed impairment during scheduled duty hours.  The order's analysis, by imposing a workplace-only limitation that the text does not contain, substitutes the trial court's narrower rule for the broader rule adopted in the CBA.

### D. The Florida Constitution and Section 381.986 Do Not Create an Accommodation Mandate

The trial court's constitutional analysis reflects a similar inversion of the actual operative text.  Quoting the limitation clause of article X, section 29(c)(6) of the Florida Constitution—"[n]othing in this section shall require any accommodation of any on-site medical use of marijuana in any . . . place of education or employment, or of smoking medical marijuana in any public place"—the trial court reasoned that the constitutional provision "therefore requires people be able to use medical marijuana in private."  The order goes further, stating, "The pertinent

15

section requires that 'Qualified Patients' be allowed to use medical marijuana off site and employers are required to make accommodations," invoking *expressio unius est exclusio alterius*. *See Crews v. Fla. Pub. Emps. Council 79, AFSCME,* 113 So. 3d 1063, 1071 (Fla. 1st DCA 2013) (describing *expressio unius* as "the expression of one thing implies the exclusion of the other" (citing *Smalley Transp. Co. v. Moed's Transfer Co.,* 373 So. 2d 55, 56 (Fla. 1st DCA 1979))).

That is precisely backwards. What the trial court did was manufacture an affirmative accommodation mandate solely by negative implication: because article X, section 29(c)(6) says that nothing in the amendment "shall require any accommodation" of medical use in a place of employment, the court reasoned that the amendment therefore *requires* employers to accommodate off-duty use. But the *expressio unius* canon is not a spell for transmogrifying a no-duty clause into a yes-duty command. At most, it is a cautious inference that applies only in narrow settings—where the thing specified can reasonably be treated as an exhaustive expression of "all that shares in the grant or the prohibition involved." *See Alachua County v. Watson*, 333 So. 3d 162, 172 (Fla. 2022) (emphasis omitted) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012)); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication . . . depends on context."); *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (explaining that the *expressio unius* canon "has force only when the items expressed are members of an 'associated group or series' " (quoting *United States v. Vonn*, 535 U.S. 55, 65 (2002))). And the caution is heightened—not relaxed—when the court is asked to find implied commands in constitutional text. *See Taylor v.*

16

*Dorsey*, 19 So. 2d 876, 881 (Fla. 1944) (explaining *expressio unius* "should be sparingly used in construing the constitution").

Here, the relevant sentence is not an "associated group or series" of accommodation rules inviting an inference about what employers must permit when employees are off-site. It is a limitation clause—written in the negative—that removes any affirmative mandate to accommodate medical use. Courts have rejected precisely the move the trial court here made: bootstrapping a positive obligation from a "nothing . . . shall be construed as requiring" disclaimer. *See Heckler v. Chaney*, 470 U.S. 821, 837 (1985) ("We think that this section simply does not give rise to the negative implication which respondents seek to draw from it."). And our supreme court has recently cautioned against using *expressio unius* as an "editorial device" to manufacture rights or duties that the text does not actually grant. *See Fla. Atl. Univ. Bd. of Trs. v. Harbor Branch Oceanographic Inst. Found., Inc.*, 423 So. 3d 842, 851 (Fla. 2025). Applied here, the trial court's negative implication reasoning does not interpret the amendment; it rewrites it.

Florida's implementing statute underscores the same point. Section 381.986 expressly preserves employer authority: it "does not limit the ability of an employer to establish, continue, or enforce a drug-free workplace program or policy." § 381.986(15)(a). Subsection (15)(b) then adds two distinct no-duty rules, phrased in the disjunctive: the statute "does not require an employer to accommodate the medical use of marijuana in any workplace *or* any employee working while under the influence of marijuana." § 381.986(15)(b) (emphasis added).

The first clause speaks to accommodation of the "medical use of marijuana" *as a workplace matter*—i.e., as a term or condition of employment within the employer's workplace regime. The legislature did

not say "on-site"; it chose the broader formulation "in any workplace," which naturally aligns with subsection (15)(a)'s preservation of an employer's ability to "establish, continue, or enforce" a drug-free workplace "program or policy." Read in that context, "in any workplace" is not fairly understood as a mere geographic limitation; it refers to the employer's workplace rules governing fitness for duty—including testing, return-to-duty requirements, and discipline—and makes clear that the statute does not compel employers to create a medical marijuana exception to those rules.

The second clause of subsection (15)(b) does separate work. It does not address the employer's right to refuse accommodation of medical marijuana use generally; it provides that an employer is not required to accommodate "any employee working while under the influence of marijuana." § 381.986(15)(b). That phrasing captures performance of work *wherever* it occurs—including on-site work, off-site responses, travel between locations, operation of vehicles, and other duties that may occur outside a fixed "workplace" in the geographic sense.

Treating either clause as merely a restatement of the other would collapse materially different language and would, in practical effect, delete one of the statute's two disjunctive limitations. Florida courts do not construe statutes by reading one clause out of existence simply because another clause addresses a related subject. Instead, we apply the whole text and antisurplusage principles: we "give effect to 'every word, phrase, sentence, and part of the statute if possible,' " and we avoid interpretations that render a coequal provision "meaningless." *See Edwards v. Thomas*, 229 So. 3d 277, 284–85 (Fla. 2017) (quoting *Quarantello v. Leroy*, 977 So. 2d 648, 651–52 (Fla. 5th DCA 2008)); *Am. Home Assurance Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 365–68

18

(Fla. 2005). That admonition has real bite here because the two clauses use different objects and do different work: the first speaks to the "medical use of marijuana" as a workplace accommodation issue, while the second separately addresses accommodating "any employee working while under the influence." *See* § 381.986(15)(b). Reading either clause as surplus is not harmonization; it is judicial excision.

The better reading—and the one consistent with the statute's plain text and structure—is that the legislature preserved an employer's discretion to refuse accommodation of medical marijuana *at all* in the workplace and separately preserved an employer's discretion to refuse accommodation for an employee working under the influence. *See* § 381.986(15)(b).

Even if we assume that the first clause of section 381.986(15)(b)— "does not require an employer to accommodate the medical use of marijuana in any workplace"—were limited to on-site workplace accommodation, that assumption would not displace the bargained-for, more restrictive substance abuse rules that were adopted for this safety-sensitive bargaining unit. Here, the CBA expressly governs the "terms and conditions of employment" for firefighters like Mr. Giambrone and prohibits drug use "at any time while employed" by Fire Rescue.[7]

Employers must implement such ratified CBA terms even when they are more specific—and therefore more restrictive—than other generally applicable employment rules. *See, e.g., Hillsborough Cnty. Gov't Emps. Ass'n v. Hillsborough Cnty. Aviation Auth.*, 522 So. 2d 358, 363 (Fla. 1988) (holding that "a public employer must implement a ratified

---

[7] In the instant case, Mr. Giambrone testified that, during the time he was actively employed, he smoked "a half a joint to a joint two to three times a day."

collective bargaining agreement with respect to wages, hours, or terms and conditions of employment" and explaining that "[t]he art of collective bargaining is one of give and take" and that employees may "forfeit some benefit to which they were otherwise entitled in order to gain" others). And once the parties have made that bargain, courts do not recalibrate it based on their own view of what would be a better policy outcome. When the contract language is clear, "the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *See Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. 2d DCA 1995) (citing *Med. Ctr. Health Plan v. Brick*, 572 So. 2d 548, 551 (Fla. 1st DCA 1990)).

Nor does article X, section 29 transform a state law protection against Florida criminal or civil sanctions into a constitutional entitlement to hold a particular public safety job on judicially rewritten terms. The County relies heavily on the First District's decision in *Velez Ortiz v. Department of Corrections*, 368 So. 3d 33 (Fla. 1st DCA 2023), which is instructive on this point. There, the court emphasized that it was not deciding "the extent of a qualified patient's right to use medicinal marijuana," but rather "whether Mr. Velez Ortiz has a right to use medicinal marijuana while being employed as a correctional officer." *Id.* at 34 n.2. The court held the termination lawful because continued marijuana use was incompatible with the statutory conditions of correctional officer certification, including the obligation to maintain "good moral character." *Id.* at 34–35.[8] While the certification

---

[8] Florida imposes a similar character-based qualification on firefighters. *See* § 633.412(4), Fla. Stat. (2019) (requiring firefighter

20

requirements and operational demands of correctional officers differ from those of fire rescue employees, the underlying principle carries force here: Florida's medical marijuana provisions do not constitutionalize continued public employment, and they do not prohibit an employer—or a collectively bargained-for agreement—from imposing and enforcing stringent fitness-for-duty standards in a safety-sensitive setting.

### E.    The Trial Court's Interpretative Chain Breaks at Every Link

Stepping back, the trial court's order depends on an interpretive chain that breaks at every link.  It first expands the CBA's definition of "Prescription or Nonprescription Medication" beyond the limiting language the parties chose—treating a registry-based authorization for restricted patient dispensing as the equivalent of a "prescription" under chapter 893 or as an over-the-counter medication "authorized . . . for general distribution and use without a prescription."  It then narrows the operative prohibitions by treating the substance abuse restrictions as essentially applicable in the physical workplace only, notwithstanding the additional "at any time while employed" prohibition and the parties' bargained-for definition of "Impaired" as a confirmed positive test.  And it ultimately infers an affirmative accommodation mandate from constitutional and statutory provisions that are written as limitations and disclaimers, not as sources of new employer duties.  *See* art. X, § 29(c)(6), Fla. Const.  On the undisputed record presented for summary judgment, those legal errors are outcome determinative.

Because the trial court's rulings rest on those same mistaken premises across all theories of liability, we turn next to the four counts of

---

applicants to "[h]ave a good moral character as determined by investigation").

the complaint to explain, claim by claim, why each fails as a matter of law under the governing texts—the Florida Constitution and implementing statute, the County's drug-free workplace framework and, most importantly, the negotiated terms and definitions in the CBA.

## III. Each of Mr. Giambrone's Counts Fails as a Matter of Law

### A. Count I

Count I, in which Mr. Giambrone alleged a violation of the Florida Civil Rights Act (FCRA) based on the County's refusal to accommodate his medical marijuana use, cannot stand on the theory adopted by the trial court. We do not hold that section 381.986(15) eliminates rights or remedies that may independently exist under the FCRA, and we need not decide whether a different FCRA claim, based on a different requested accommodation or different employment terms, might be viable. The problem here is narrower: the accommodation the trial court ordered was not an accommodation required by Florida's medical marijuana framework, the CBA, or the County's policy. Section 381.986(15) expressly preserves an employer's authority to "establish, continue, or enforce a drug-free workplace program or policy," and it makes clear that the medical marijuana statute itself neither requires workplace accommodation of medical marijuana nor creates a marijuana based wrongful discharge or discrimination cause of action. The trial court nevertheless treated Florida's medical marijuana framework as creating an affirmative accommodation mandate and then used that perceived mandate to impose FCRA liability. Because the Count I judgment rests on that erroneous premise—and because the trial court identified no independent FCRA basis requiring the County to convert Mr.

22

Giambrone's positive marijuana test into a negative result—the judgment on Count I cannot stand.[9]

## B.   Count II

Count II, in which Mr. Giambrone claimed wrongful termination or wrongful discipline, fails for the same core reasons and for an additional, independent one.  As pleaded and adjudicated, this count is premised on the County's refusal to treat a medical marijuana card as sufficient justification for a verified positive test result and on the trial court's view that discipline is unlawful absent proof of on-duty impairment.  But the County's ability to enforce its drug testing rules is preserved—not restricted—by section 381.986(15), and the trial court's "proof of on-duty impairment" overlay is not found in the constitution, the statute, the CBA, or the County's drug-free workplace policy.

Beyond that, to the extent Count II is best understood as a marijuana-based wrongful discharge or discrimination theory—as opposed to a pure contract claim—the legislature has directly addressed that framing: the implementing statute "does not create a cause of action against an employer for wrongful discharge or discrimination."  *See* § 381.986(15)(c).  The trial court's order effectively created that very cause of action by judicial decree, and the judgment in favor of Mr. Giambrone on Count II, therefore, cannot stand.

## C.   Count III

Count III, in which Mr. Giambrone alleged that the County failed to update or amend its drug-free workplace policy, fails because it seeks

---

[9] *Cf. Beckman*, 2026 WL 91580, at *12–13 (rejecting reliance on the trial court's ruling in this case, explaining that "the FCRA follows federal law as set forth in the ADA" and that federal law "still classifies marijuana as an unlawful drug," and granting summary judgment on FCRA claims while citing section 381.986(15)(a) and (b)).

relief that courts are not empowered to grant: an alteration of workplace policy for a coordinate branch of local government. Article II, section 3 of the Florida Constitution establishes a strict separation of powers: "No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein," and Florida courts have "traditionally applied a strict separation of powers doctrine." *See Fla. House of Representatives v. Crist*, 999 So. 2d 601, 611 (Fla. 2008) (quoting *Bush v. Schiavo*, 885 So. 2d 321, 329 (Fla. 2004)). Consistent with that principle, "courts cannot legislate" and they "cannot abrogate, modify, repeal, or amend" established rules simply because a different policy choice might seem preferable. *See State v. Egan*, 287 So. 2d 1, 7 (Fla. 1973). And where litigants ask the judiciary to step into a policymaking role, our supreme court has been clear that courts must refuse: "Petitioners invite this Court to . . . inject itself into . . . policy making and oversight. We decline the invitation for the courts to overstep their bounds." *See Citizens for Strong Schools, Inc. v. Fla. State Bd. of Educ.*, 262 So. 3d 127, 142 (Fla. 2019). Count III—and the trial court's corresponding countywide directive compelling the County to "provide an accommodation" and thereby effectively rewrite its drug-free workplace policy—runs headlong into these separation-of-powers limits and cannot support judgment as a matter of law.

Even if one assumes, as Mr. Giambrone's counsel tacitly suggested at argument, that this lawsuit was designed to force the County to bring its policy current to account for the legalization of medical marijuana,[10]

---

[10] The countywide drug-free workplace policy in the record is effective October 1, 2015, meaning it predates the adoption of Florida's medical marijuana amendment. But nothing in the constitutional amendment or its implementing statute imposes an affirmative obligation on employers to revise or update preexisting drug-free workplace policies

that objective underscores the problem rather than solves it. The County's drug-free workplace policy is a policy choice committed to the political branches, subject to the limits imposed by enacted law; it is not a policy vacuum that can be filled by judicial preference. And here, the enacted law—including the constitutional text the voters approved—cuts the other way. The medical marijuana amendment provides limited protections against *state law* sanctions for "medical use" by a qualifying patient, but it expressly disclaims any mandate that employers accommodate on-site use in a place of employment and further disclaims any requirement to violate (or immunity from) federal law. *See* art. X, § 29(a)(1), (c)(5)–(6), Fla. Const. The implementing statute then

in response to subsequent changes in Florida's marijuana laws. To the contrary, the implementing statute expressly preserves an employer's authority to "establish, continue, or enforce a drug-free workplace program or policy" and makes clear that it "does not require an employer to accommodate the medical use of marijuana." § 381.986(15)(a)–(b). It also provides that the statute "does not create a cause of action against an employer for wrongful discharge or discrimination." § 381.986(15)(c). Courts are not at liberty to add a duty that the voters and legislature did not enact. *See Lawnwood Med. Ctr., Inc. v. Seeger*, 990 So. 2d 503, 512 (Fla. 2008)

The same point is reinforced by the CBA, which was executed after the medical marijuana amendment was ratified. Thus, the parties negotiated and ratified the governing agreement against the backdrop of an already existing medical marijuana regime, yet they retained the same restrictive substance abuse language, including the definition of "Prescription or Nonprescription Medication" and the prohibition on drug use "at any time while employed." Relatedly, Florida law recognizes that the laws existing at the time and place a contract is made and to be performed "enter into and become a part of the contract as if they were expressly referred to or actually copied or incorporated therein." *See Shavers v. Duval County*, 73 So. 2d 684, 689 (Fla. 1954). Thus, even apart from the County's preexisting policy, the parties' postamendment CBA confirms that no medical marijuana exception was negotiated into the terms governing these firefighters.

25

reinforces those limits by preserving an employer's authority to "establish, continue, or enforce a drug-free workplace program or policy" and by clarifying that the statute "does not require an employer to accommodate the medical use of marijuana" in the workplace. § 381.986(15)(a)–(b).

The trial court's countywide, prospective command that the County must "provide an accommodation" to *any* employee who produces a medical marijuana card after testing positive is not statutory interpretation; it is policymaking of the most direct kind. And it is absolutely forbidden by our constitution. *See* art. II, § 3, Fla. Const. There is no justification or legal authority for a judicial order compelling the County to rewrite its workplace drug policy in all employment contexts. Accordingly, judgment in favor of Mr. Giambrone on Count III must fail.

### D.    Count IV

Count IV, in which Mr. Giambrone alleged breach of contract, fails because the trial court's contract analysis depends on a rewritten definition. The CBA is the bargained-for governing document for this bargaining unit; and where the CBA speaks to drug testing, impairment, and prohibited conduct, those negotiated terms are the operative rules for Fire Rescue employees. *See, e.g.*, *Hillsborough Cnty. Gov't Emps. Ass'n*, 522 So. 2d at 363.

As the County repeatedly insists, the CBA broadly prohibits employees from using or being under the influence of drugs in multiple enumerated circumstances, and it also prohibits employees from using drugs "at any time while employed by Hillsborough County Fire Rescue, other than alcohol or prescribed medications." As we've explained, medical marijuana is not a prescribed medication within the meaning of

26

the CBA. The CBA defines "Impaired" as "a confirmed positive drug test," and it requires, after a first confirmed positive and release to return to work, "a return-to-work drug test" and that "[a] negative test result must be obtained prior to an employee returning to work." These provisions are not consistent with the trial court's conclusion that a verified marijuana positive test must be treated as "negative" based on a registry card or with its conclusion that the County may discipline only upon proof of contemporaneous on-duty impairment.

Section 40.2(L) of the CBA doesn't save Count IV either. As we've explained, the "Prescription" prong incorporates the statutory definition in section 893.02(24), which itself requires that a prescription "meet[] the requirements of s[ection] 893.04," and section 893.04 is the pharmacist-dispensing framework—meaning the definition the parties adopted is tethered to a pharmacist-based prescription system that medical marijuana does not and cannot satisfy. And the alternative "nonprescription" prong covers medications "authorized pursuant to federal or state law for general distribution and use without a prescription"; medical marijuana—available only through a restricted, patient-specific regime—does not fit that description under Florida law.

In short, the trial court found a breach only by first expanding the contract's limiting terms into something they are not. Courts are not authorized to "rewrite a contract" to supply materially different terms than the parties chose. *See Emergency Assocs. of Tampa, P.A.*, 664 So. 2d at 1002 (rejecting construction that "would allow a trial court to rewrite a contract" and "give a trial court free reign to modify a contract"). Because the County's actions were governed by, and consistent with, the actual negotiated text—and because medical marijuana does not qualify as a "Prescription or Nonprescription Medication" within the meaning of

27

those terms as defined in the CBA—summary judgment for Mr. Giambrone on Count IV cannot stand.

## IV. The Scope of Relief Requires Reversal

Finally, even if the merits were closer than they are, the breadth of relief the trial court ordered would independently require reversal. The trial court decreed that the County is "prohibited from discriminating against and must provide an accommodation to employees who present a valid State of Florida Medical Marijuana Card after testing positive for marijuana" subject only to a lack of "evidence" of on-duty use or impairment. That sweeping, forward-looking directive is indistinguishable from injunctive relief running in favor of nonparties and across all County employment contexts, yet this is not a class action and our record confirms the nonexistence of pleadings seeking any sort of injunction, never mind broad, systemwide relief that effectively constitutes a mandatory injunction. Florida law is clear that "courts are not authorized to award relief not requested in the pleadings"; granting unrequested relief violates due process and is reversible error. *See Booth v. Hicks*, 301 So. 3d 369, 370–71 (Fla. 2d DCA 2020).

We recognize that reversal for unpreserved error[11] in civil cases is "exceedingly rare" and that the fundamental error doctrine is generally applied with great restraint, reserved for when the error "implicate[s] a constitutional right, such as due process." *See Coba v. Tricam Indus., Inc.*, 164 So. 3d 637, 646 (Fla. 2015) (citing *Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1026 (Fla. 2000)); *see also I.A. v. H.H.*, 710 So. 2d 162, 165 (Fla. 2d DCA 1998) ("[I]t is our duty to notice and correct . . . fundamental errors even when they have not been identified by the

---

[11] The County's counsel forthrightly acknowledged at oral argument that this point was not preserved.

parties."); *Bui v. Panzardi*, 416 So. 3d 1158, 1159 n.1 (Fla. 4th DCA 2025). When an order imposes broad, prospective, unrequested relief on a government employer—impacting employees who are not parties and deciding future disputes not before the court—without notice or an opportunity to be heard on that remedy, the fundamental error doctrine must apply, or it has no force whatsoever.[12]

Whatever one thinks of the underlying policy question concerning medical marijuana usage, the trial court's order goes far beyond adjudication and individual dispute resolution. It is straight-up policymaking, and policymaking is exclusively a function of the executive and legislative branches; it is not within the province of the judiciary. *See* art. II, § 3, Fla. Const. For this reason alone, the trial court's order cannot stand.

## V. Disposition

In the end, this appeal is not a referendum on medical marijuana, but rather a reminder that courts do not rule on intuition or based on popular sentiments, and they do not govern at all. Our task is to apply the law the people adopted, the legislature enacted, and the parties themselves negotiated—not to revise it to fit a preferred outcome, and not

---

[12] We note an additional due process concern inherent in the breadth of the prospective relief entered here. The judgment purports to regulate the County's future employment practices well beyond the parties and claims before the court, effectively establishing a countywide rule of general applicability. When a trial court imposes relief of that character without appropriate pleadings, notice, and an opportunity to be heard, the due process injury is not confined to the litigants. *All* individual citizens of Hillsborough County have an interest in how the County administers public safety services and implements personnel policies for employees who perform such services. A sweeping decree that constrains how the County may staff and deploy such personnel implicates broader public interests that were never joined or meaningfully addressed in the adversarial process below.

29

to convert a narrow dispute into a countywide policy decree. The final judgment did all three: it rewrote the bargained-for terms defining "Prescription," "Nonprescription," "Impaired," and the scope of prohibited drug use; it derived an affirmative accommodation mandate from provisions framed as limitations and disclaimers; and it imposed sweeping prospective relief untethered to the pleadings, the adversarial presentation, and the constitutional separation of powers.

Because the material facts are undisputed and Hillsborough County is entitled to judgment as a matter of law under the Florida Constitution, section 381.986, the County's drug testing framework, and the negotiated CBA governing this safety-sensitive workforce, we reverse the final summary judgment in its entirety, vacate the broad prospective relief, and remand with instructions to enter final summary judgment for Hillsborough County on all counts.

Reversed; remanded with instructions.


SILBERMAN, J., Concurs in result only with opinion.
SMITH, J., Concurs specially.


SILBERMAN, J., Specially concurring in result only.

I concur in the result reached by the majority opinion based on its thorough analysis of the terms of the Collective Bargaining Agreement between the County and the union to which Mr. Giambrone belongs, Florida's constitutional and statutory provisions, and federal law. However, the opinion goes beyond what is necessary to decide the case, including addressing unpreserved arguments. Additionally, while I agree that the trial court erred in its analysis, the trial court undertook to resolve complicated issues for which there has been little guidance under Florida law up to this point. I disagree with the majority's

30

characterization that the trial court was attempting to act as a substitute for the executive and legislative branches or was ruling "on intuition or based on popular sentiments." For these reasons, I concur in result only.

SMITH, Judge, Specially concurring.

I concur with the majority's well-reasoned analysis that the trial court erred in granting final summary judgment in favor of Mr. Giambrone and that the order on appeal should be reversed. However, the majority also remands with instructions for the trial court to enter final summary judgment for the County. Such disposition would require resolving Mr. Giambrone's FCRA claims and granting the County's motion for summary judgment. Neither of which the majority addresses in determining that the County is entitled to final summary judgment as a matter of law. And so while I agree that final summary judgment should ultimately be entered in the County's favor, I disagree that the majority opinion completely resolves the case where it stops short in failing to address Mr. Giambrone's claims under the FCRA.

The root of Mr. Giambrone's case stems from his employment with the County. One of the claims in his complaint arises under the FCRA, asking for a reasonable accommodation. Because he was allegedly denied a reasonable accommodation he brought a constructive discharge claim, also under the FCRA. The trial court erred in granting summary final judgment in favor of Mr. Giambrone where his request did not meet the reasonableness test under the FCRA.

In order to resolve the FCRA claims brought by Mr. Giambrone, the issues that should be decided are whether Mr. Giambrone is a "qualified individual with a disability" and whether the County "failed to provide a

31

reasonable accommodation." *See D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1021 (11th Cir. 2020). What is reasonable depends upon the facts and circumstances of each case. And the question of what is reasonable can only be answered by applying the applicable law under the FCRA. When applied here, because Mr. Giambrone is not a "qualified individual" and because his requested accommodation is not reasonable under the FCRA, the County was entitled to summary judgment on counts I and II, consistent with its cross-motion for summary judgment.

A major function of Mr. Giambrone's job is performing "emergency paramedical trainee duties in diagnosing illnesses or injuries and rendering emergency care," which may include, among other responsibilities, providing emergency medical care and safely and efficiently operating emergency response vehicles. The CBA recognizes that "the [County] is engaged in furnishing essential public services which vitally affect the health, safety, comfort[,] and well-being of the public and their best interest will be served by the assurance of orderly, efficient and uninterrupted operations to the public, at all times." Section 40.1(A)(5) of the CBA provides that employees are prohibited from using drugs "at any time while employed by Hillsborough County Fire Rescue, other than alcohol or prescribed medications." Similarly, the County has a zero-tolerance drug-free workplace policy in compliance with Florida's Drug-Free Workplace Act, codified in section 112.0455, Florida Statutes (2019).

Additionally, firefighters are held to particular qualifications that are set forth under section 633.412, Florida Statutes (2019). Under section 633.412, a firefighter must: "(2) [n]ot have been convicted of a . . . felony or a crime punishable by imprisonment of 1 year or more under the law of the United States or of any state thereof . . . ," and "(4) [h]ave

32

good moral character as determined by investigation under procedure established by the division." (Emphasis added.)

There can be no dispute that Mr. Giambrone's job requires him to perform safety sensitive tasks and his job directly relates to the County's provision of "essential public services which vitally affect the health, safety, comfort[,] and well-being of the public." The zero-tolerance drug-free workplace policy and portions of the CBA serve a bona fide occupational requirement that is reasonably related to the essential functions of Mr. Giambrone's job—to ensure that the provision of public services is performed safely by those who are not impaired.

Here, Mr. Giambrone asked the County to put all of that aside in order to accommodate his legal use of medical marijuana for his disabilities under Florida law, seeking a "reasonable accommodation" in Count I and redress as a result of his suspension/constructive discharge in Count II under the FCRA. Mr. Giambrone complained of the County's failure to allow him to continue using medical marijuana outside of work. Relying on section 381.986(2)(k), Mr. Giambrone claimed that his disabilities—anxiety and insomnia—are "qualifying medical conditions" under the catchall list of "[m]edical conditions of the same kind or class as or comparable to those enumerated in paragraphs (a)-(j)." Be that as it may, whether Mr. Giambrone's disabilities constitute "qualifying medical conditions" under section 381.986 has no bearing on whether Mr. Giambrone is entitled to an accommodation under the FCRA.

To prevail on an accommodation claim under the FCRA, a plaintiff must show: "(1) [he] was a qualified individual with a disability; (2) [he] made a specific request for a reasonable accommodation; and (3) [his] [employer] failed to provide a reasonable accommodation, or engage in the requisite interactive process in order to identify a reasonable

33

accommodation." *D'Onofrio*, 964 F.3d at 1021. The record evidence establishes that Mr. Giambrone made a specific request for an accommodation, and so prongs one and three are examined below.

First is the issue of whether Mr. Giambrone is a "qualified individual." The fact that Mr. Giambrone may be disabled does not necessarily mean that he is a "qualified individual" with a disability for purposes of the FCRA. "Florida courts construe the FCRA in conformity with the federal Americans with Disabilities Act ('ADA')." *Lenard v. A.L.P.H.A. "A Beginning" Inc.*, 945 So. 2d 618, 621 (Fla. 2d DCA 2006) (citing *McCaw Cellular Commc'ns of Fla., Inc. v. Kwiatek*, 763 So. 2d 1063, 1065 (Fla. 4th DCA 1999)). The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Mr. Giambrone argues that he meets this definition. While the County did not question whether Mr. Giambrone met this definition, the County aptly raised in their affirmative defenses and motion for summary judgment that Mr. Giambrone is precluded from claiming protection under the FCRA because marijuana remains illegal under federal law.

Mr. Giambrone asks us to look no further than section 381.986, as did the trial court. But even that narrow examination does not provide Mr. Giambrone with protection in the workplace setting—and this is where the trial court veered off course, in relying on the enactment of section 381.986 and disregarding the proper FCRA analysis, finding that "the crux of this dispute is rooted in Florida state law, not federal law." This ignores that the FCRA is mirrored after federal law and will generally be construed in conformity with federal law. *See Brand v. Fla. Power Corp.*, 633 So. 2d 504, 509 (Fla. 1st DCA 1994) ("[B]ecause of the

34

similarity in the provisions of [the FCRA and section 504 of the Rehabilitative Act] we follow the instruction of numerous state decisions, recognizing that if a Florida statute is modeled after a federal law on the same subject, the Florida statute will take on the same construction as placed on its federal prototype, insofar as such interpretation is harmonious with the spirit and policy of the Florida legislation.").

While Mr. Giambrone relies on *Barbuto v. Advantage Sales & Mktg., LLC*, 78 N.E. 3d 37 (Mass. 2017), which recognized that off-site, physician-authorized use of medical marijuana is a reasonable accommodation where no on-duty impairment is shown, *Barbuto* is distinguishable on two fronts. First, Mr. Giambrone performs safety sensitive functions and is required to abide by the statutory qualification certifications mandating that he have good moral character and not be a convicted felon, whereas Ms. Barbuto held an entry level position with a sales and marketing company. *Id.* at 41. Second, *Barbuto* concerns Massachusetts law, which specifically, and significantly, provides that "patients shall not be denied 'any right or privilege' on the basis of their medical marijuana use. . . . A handicapped employee in Massachusetts has a statutory 'right or privilege' to reasonable accommodation under G.L. c. 151B, §4." *Id.* at 45. The guidelines under the laws of Massachusetts define the key terms "handicap," "qualified handicapped person," and "reasonable accommodation." *Id.* at 43-45. In contrast to the laws of Massachusetts, the FCRA fails to define "handicap," "qualified individual," and "reasonable accommodation" and has historically applied federal law under the ADA when addressing FCRA disability discrimination claims. *See McCaw*, 763 So. 2d at 1065 (Fla. 4th DCA 1999); *Greene v. Seminole Elec. Coop, Inc.*, 701 So. 2d 646, 647 (Fla. 5th DCA 1997). At bottom, *Barbuto* applied existing Massachusetts state

35

statutes and corresponding Massachusetts state case law to Ms. Barbuto's Massachusetts state discrimination claim.

Relevant here, the FCRA makes it unlawful for an employer to discriminate against an individual because of that individual's handicap. § 760.01, Fla. Stat. (2019). The term "handicap" is not defined under the FCRA. The FCRA in the disability context is the analog to the ADA, and as such is analyzed in conformity with the ADA. *See Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 926 (Fla. 4th DCA 2007) (construing the term "handicap" under the FCRA based upon the ADA's definition of "disability"); *Brand*, 633 So. 2d at 509-10, 510 n.8.

In relying solely on section 381.986, the trial court overlooked the proper application of the FCRA under the ADA framework, and, thus, failed to recognize that the ADA specifically provides that "a qualified individual with a disability shall not include any employee . . . who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." *See* 42 U.S.C. § 12114(a). To be sure, federal law, at the time Mr. Giambrone brought his complaint, defined marijuana as a Schedule I hallucinogen under the Controlled Substances Act. 21 U.S.C. § 812(c), Sched. 1(c)(10).; *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 492 (2001) (recognizing Schedule I as the most "restrictive schedule" of the five schedules of controlled substances). Similarly, under Florida law, "cannabis"—the technical name for marijuana—is classified as a Schedule I controlled substance under section 893.03(1)(c)7. However, Florida law acknowledges an exception that marijuana dispensed from a medical marijuana treatment center for medical use by a qualified patient does not constitute a Schedule I controlled substance. *See* §§ 381.986, 893.02(3). Federal law does not contain any exceptions that would allow for doctor-supervised

36

marijuana use, and so it is no surprise that under the ADA an employee using marijuana is not a "qualified individual."[13]

In fact, as the First District noted in *Velez Ortiz*, "under the [ADA], there are no valid prescriptions for marijuana. Because marijuana may not be validly prescribed under federal law, mere possession of marijuana is a felony under federal law." 368 So. 3d at 35 (citing *Gonzales v. Raich*, 545 U.S. 1, 14 (2005)). While *Velez Ortiz* did not analyze the use of medical marijuana by a firefighter under the FCRA, the conclusion in that decision is both instructive and persuasive—a conclusion the trial court disagreed with finding "[t]here is no analogous provision of law holding EMTs and correctional officers to the same duty of moral character." This conclusion is faulty. Foremost, like Mr. Velez Ortiz, Mr. Giambrone holds a medical marijuana card to treat his disabilities. Second, also like Mr. Velez Ortiz, Mr. Giambrone was subject to specific qualifications for certification as a firefighter to not be a convicted felon under the laws of the United States or any state law. § 633.412(2). Third, Mr. Giambrone was also required under section (4) to "[h]ave good moral character as determined by investigation under procedure established by the division." Based upon the sound reasoning in *Velez Ortiz*, Mr. Giambrone, like Mr. Velez Ortiz, cannot meet his statutory qualifications for certification where his continued use of marijuana is a felony under Federal law, and thus results in the failure to maintain his good moral character. *See id.*; *see also Despears v. Milwaukee County*, 63 F.3d 635, 637 (7th Cir. 1995) (holding that

---

[13] There appears to be a direct conflict between federal and Florida law as to the illegality of medical marijuana usage. The County admitted at oral argument that it did not raise the issue of preemption. And while the Attorney General's office argued preemption in its amicus brief and at oral argument, that issue has not been preserved for appellate review.

employers have no duty to provide an accommodation that overlooks unlawful behavior); *Hogue v. MQS Inspection, Inc.*, 875 F. Supp. 714, 722 (D. Colo. 1995) (holding it unreasonable to require an accommodation which eliminated even one of the essential functions of the employee's job).

No Florida court has been presented with this precise issue, but because Florida courts are to apply federal law in interpreting the FCRA, an employee using marijuana would not be a qualified individual. *See, e.g., James v. City of Costa Mesa*, 700 F.3d 394, 402-03 (9th Cir. 2012) (concluding that "doctor-supervised marijuana use is an illegal use of drugs not covered by the ADA's supervised use exception," reasoning "[t]here is not one word in the statute or in the legislative history suggesting that Congress sought to exclude from the definition of illegal drug use the use of a controlled substance that was lawful under state law but unlawful and unauthorized under federal law").

Finally, critical to any FCRA analysis is whether the request for an accommodation was reasonable under the circumstances. *See Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007) (holding the failure to reasonably accommodate a disabled individual is itself discrimination). The crux of Mr. Giambrone's FCRA claims is the failure to accommodate. But an employee is not entitled to the accommodation of their choice; rather, they are only entitled to a reasonable accommodation. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). What is "reasonable" is not always a one-size-fits-all determination but is to be considered based upon the facts and circumstances of each case. *See Leme v. S. Baptist Hosp. of Fla., Inc.*, 248 F. Supp. 3d 1319, 1346 (M.D. Fla. 2017) ("[W]hat is reasonable for each individual employer is a highly fact-specific inquiry

38

that will vary depending on the circumstances and necessities of each employment situation." (quoting *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1527 (11th Cir. 1997))).

Under the FCRA, it was Mr. Giambrone's burden to establish that his request for the County to accommodate his off-duty use of medical marijuana based upon his disabilities was reasonable. *See Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). He did not accomplish that below and the trial court erred by failing to address the reasonableness of the request in light of the County's obligations to public safety and welfare, the County's drug-free workplace policy, the CBA, the firefighter qualifications for certification statute, and the essential functions of Mr. Giambrone's job in safely providing emergency medical care and operating medical response vehicles. *See LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("An 'accommodation' is 'reasonable'—and, therefore, required under the ADA—only if it enables the employee to perform the essential functions of the job.").

Finally, nothing in section 381.986(15)(b) and (c) alter or eliminate the rights of an employee under any other statute, including the FCRA which does create causes of action for wrongful discharge and discrimination based upon a failure to make reasonable accommodations. The plain text of subsections (b) and (c) merely makes clear that the statute is not creating any specific duty or causes of action based upon the enactment of section 381.986. Nor does the plain text conflict with the FCRA; section 381.986 does not mention the FCRA, nor does it state that an employer is immune from suit, or otherwise not liable for violations under the FCRA. Certainly, "[t]he Legislature did not include such language, and we cannot add it on our own." *See*

39

*Kasischke v. State*, 991 So. 2d 803, 810 (Fla. 2008). To hold otherwise would impermissibly rewrite the plain text of section 381.986 and grant an employer statutory immunity for violations of the FCRA under a completely different statute.

In conclusion, section 381.986 does not explicitly immunize an employer from liability under the FCRA. But because Mr. Giambrone failed to demonstrate that his specific request for an accommodation— that the County allow him to continue to work in violation of federal law and contrary to the County's drug-free workplace policy, the CBA, the firefighter qualifications for certification, and the essential functions of his job—was reasonable, the County was entitled to final summary judgment pursuant to its motion for summary judgment.

———————————————————

Opinion subject to revision prior to official publication.